My name is Peter Sink and I do represent the employer respondent in this case. We are here appealing the decision of the Commission which overturned Arbitrator Neal's decision in favor of the respondent's claim. We believe that the findings of the Commission are against the manifest weight of the evidence. In that, the petitioner failed to provide competent medical causation evidence, which is their burden in this claim. I think that that's the crux of really all of our issues on appeal. In this claim, the respondent had an independent medical examination with Dr. Leventhal, who is a board-certified orthopedic surgeon. He indicated that the petitioner was at NMI and needed no surgery. Dr. Fulbright was a board-certified orthopedic or neurosurgeon, excuse me. He was the petitioner's treater and he indicated that the petitioner needed no further medical care or surgery. Now, who's Dr. Furry? Dr. Furry is who the petitioner chose to rely on in this claim and Dr. Furry was an anesthesiologist who never saw the petitioner until a year and seven months post-accident, post this date of accident, but post an intervening accident also. However, he did opine that the annular tears were caused by the work accident, correct? He did opine that the annular tears were caused by the work accident, but then on cross-examination said, I was never provided with any prior Dr. Kahn records, I was never provided with any Dr. Fulbright records, I never saw the Dr. Leventhal IME, I never saw the MRI reports, I never saw the CT scan, and I didn't understand in the end even what the discogram said and you should talk to Dr. Payne who performed the discogram because I don't understand what his claim is. So let me ask you the pointed question. Is there some evidence in the record to support the commission's finding? I believe there is no sufficient evidence in the record to support the commission's finding in terms of causation for the 9-14-2007. Okay, but you'd have to get around Furry's opinion, correct? Albeit weak foundation, you're arguing that it's flawed, etc., etc., but nevertheless it stands in the record, correct? It stands in the record, but I believe Furry disqualifies himself as a medical causation expert in this case in his cross-examination when he says you should talk to some of the other doctors about this. I do not feel qualified to speak on the issue of the discogram. And the discogram is the only objective finding which supports a tear in the disc, which Dr. Furry says directly, I don't understand what the findings are here. There is an issue in this case of an intervening accident also. Whether the intervening accident caused a new back injury or didn't cause a new back injury, we still say that this petitioner began treating for his back on August 15, 2007, a month before he claimed a work-related accident. No one has suggested that there was not a work-related accident on September 14, 2007. He had clear bruising to his thigh and leg, and those pictures were admitted into evidence. No one has ever refuted that. What we are saying is if you had a serious enough back injury, that was any different from the August 15 visit a month prior there too, you would have gone to the doctor prior to 11 weeks later on November 30, 2007. Who's Dr. Kahn? Dr. Kahn was his family physician that had been treating him prior to the date of the accident, and Dr. Kahn is a physician who he saw on August 15, exactly a month before, for a back pain issue. Didn't Kahn order an MRI of the lumbar region? Dr. Kahn on January 18, 2008, suggested an MRI. None was ordered at that time, and none was done. Well, didn't the commission see this as some evidence that the claimant's low back pain was present prior to the February 14, 2000 accident? The commission did see that as evidence. However, there's no causation opinion from Dr. Kahn indicating that it's not related to the August 15, 2007 accident. And the fact here remains that the petitioner could have sought an opinion from Dr. Kahn, a narrative report, an evidence deposition, anything linking up the need for continued back treatment to the September 14 incident, as opposed to it being the ordinary process of the degenerative disease of arthritis in the back, which is ultimately what orthopedic surgeon Fulbright found that this was, and Leventhal found that this was. Let me see if I can understand this. You're saying, you're recognizing Furr's opinion, but you're saying the opinion is only as good as the underlying facts upon which it relies, evidence that he relies is flawed, ergo his opinion is worthless, sort of would you say? Correct. And I'm saying that that is the only opinion offered by the petitioners otherwise in this case. When there were so many other choices they could have made, and each of those choices all qualified, you know, the orthopedic surgeon Fulbright, he did the MRI, the CT, the bone flexion scan, all ten and a half months post this alleged date of accident, all which he read as essentially normal, all which he concluded would never cause this petitioner to require a surgical procedure, and all after, by the way, this intervening accident of February 14, 2008. Now, I'm not suggesting that the intervening accident did necessarily do anything additional to the back. What I'm saying is it is there. While it may be a distraction, there's nothing between August 2007 and that intervening accident of February 14, 2008, suggesting that there was a traumatic injury to the petitioner's back. The only clear fact that we have relative to the petitioner's back is that a month before he alleged the September accident, he was in about his back. Now, why can he go in a month before the date of the accident saying my back hurts, but all of a sudden it becomes critical the day after the accident, and he didn't seek medical treatment for 11 weeks? Why can the commission go back and say, well, it's got to be related to September, because that's a filed-to-work comp claim. It can't possibly be related to his August 15 visit and an arthritic condition. And it can't possibly be the natural progression of an arthritic condition. It must be something that we can pin on a respondent in the state. I think that the commission overreached. I think they overreached by overturning arbitrator Neal's decision in this case when she had the opportunity to see the petitioner testify, to see his cross-examination, to see his witness testify, to see our courier's witness testify, and to review all of the evidence. She had the opportunity to see the credibility on their faces, the facial expressions. She had the opportunity to see them impeached by some of their inconsistent statements. For example, the petitioner and his witness were really bent on saying, we were never given the opportunity to take time off of work. So the calendars were brought in. Who's Dr. Fulbright? I'm sorry? Who's Dr. Fulbright? Dr. Fulbright is a neurosurgeon that Dr. Kahn referred the petitioner to on May 2, 2008, ten and a half months after. He did not find a causal link, did he? He did not find a causal link and offered no opinions in this case. And he would have been an excellent choice to seek out an opinion from by petitioner. So in this case, there are inconsistencies. And if I could direct myself back to the petitioner and his witness, they were found to not be credible witnesses because the arbitrator found that the calendars showed marked days off throughout the years for vacations, personal court times, other doctors' visits. The petitioner stated in his testimony, we weren't allowed to see doctors. Yet he had no problem after the February accident going to the doctor constantly. And so there is something about the February accident which changed the course of this back. There's something before that didn't occur. And really, the manifest weight of the evidence test here has to be looked at by this court as a finding reversing the commission, suggesting that there is not enough evidence at all in the record for the commission to have overturned the arbitrator's decision, finding that there wasn't an intervening accident. We would ask that you overturn the commission's decision based upon that very fact, that there is no causal connection opinion otherwise, linking this to the September 14, 2007, date of accident. Thank you, counsel. Thank you. Mr. Shea. Thank you. May it please the court. Counsel, I want to start off with something that counsel just addressed that I think is very important about the office visit with Dr. Kahn prior to the date of accident, September 14, 2007, and the one that took place in November, 2007. If you'll recall, Dr. Kahn, the primary care physician, internal medicine physician, my client came one month before the accident with simple back pain that he described as a toothache. Dr. Kahn performed a straight leg test. That is a neurological clinical examination to rule out whether there's any neurologic basis. That was negative. In November, when my client returned to Dr. Kahn post-accident, a straight leg test was positive at 90 degrees. Something changed. Counsel's correct. He's looking at the wrong date. Something changed on September 14, 2007. You can look at the photographs that were taken of the trauma to my client. This is not a simple picking up a box and, ooh, my back hurts. This was a guy that was wedged between the platform and the trailer for approximately 10 minutes. And he even reported low back pain on his report that he filled out. Even his boss indicated that he experienced low back pain and that he was going to try to work through it. Now, if we talk about the practicality of the situation, my client worked for a trucking firm. If you know anything about trucking firms, people come and go like realtors. Now, should we take judicial notice of that? Sure. I don't know. But the point is, the practical situation is my client wanted to keep his job from the very beginning. If we look at what he said to his boss, he was going to work through it. He was going to continue. He told Dr. Fulbright, I've got to get back to work or I'm going to lose my job. In July, he says, I don't feel I can return to work, but I need to get back to work. Please get me back to work. Fulbright says, I'll return in six weeks. Let me ask you this. Sure. The opponent is saying this. He points out Dr. Kahn, the claimant's treating physician, did not offer any opinion regarding the claimant's low back pain during the time he treated the claimant after the September 14, 2007 accident. Likewise, Dr. Fulbright, who treated your client after Dr. Kahn, did not also find a causal link. Then we have Dr. Leventhal clearly opine that the causal connection did not exist. And you've got Dr. Furry. You have all these witnesses on one side and you've got Dr. Furry. I don't see how you have all the witnesses on one side. They may not have given opinions. Dr. Furry did give an opinion. So the question is, can any rational trier effect support the decision that was by the commission? If you look at the commission decision and you look at the arbitrator's decision, they're only different with one respect. Both of them find an accident. Both of them find treatment related up until the intervening accident. The commission differs with arbitrator Neal in that the intervening accident did not break the causal connection link. If you look at Vogel, if you look at other cases that discuss this, the February 16, 2008 accident was an injury to the thumb. He never made a claim for an injury to his back. He understood. He had filed a previous work time claim. He understood how the system worked. He reported all the injuries that he had on the prior accident. On this accident, only the thumb. He settled down on the thumb. He had no lost time on the thumb. The February 2008 accident is not relevant to this discussion. So that's what the commission determined, that arbitrator Neal was incorrect when she stopped the causal link at that point in time. So we have causal connection up until the February 2008 accident. We have a difference thereafter. We have an individual who saw every physician that he went to, he was consistent with his histories of linking it to the September 2007 accident. We have that consistency. We have a consistency also with the functional capacity assessment that was done with Social Security. We have consistencies with an employee who worked alongside my client who corroborated the story and the testimony by my client. We have, most important, in November 2007, Dr. Kahn recommended an MRI. He had never recommended an MRI before. So that gives further substance to the commission's decision that there was no causal break in February 2008. The fact that the MRI was taken afterwards really doesn't add to our discussion, because it was requested beforehand. And Dr. Furry said there were annular tears that were consistent with the complaints that the plaintiff made. If we look at the complaints that the plaintiff made from Dr. Kahn, starting in November, up through the time that my client saw Dr. Furry, they were consistent. The complaints did not change after September 14, 2007. They were different before the accident. It was simply back pain. Afterwards, it was much more different. It was radiating. It was a different type of complaint. So the assessment, as I've heard, this is the third one, I've heard every one of you say, counsel, with the appellant, aren't we really here on a manifest way to be evidence? In other words, is there any evidence whatsoever that would support the finding of the commission? That's what the assessment and that's what your evaluation is today. So you can look and you can nitpick and you can say so-and-so testified, so-and-so didn't testify. But your actual analysis, your honors, if I may, is whether there is evidence that would be supportive of the commission's decision. I think what the case law says is sufficient evidence. Not just any evidence. Sure. Not just some evidence. Right. But there is sufficient evidence. And if you look at the medical records and how they evolve, something happened in September 2007 that changed this man's life. And if you have nothing further, thank you very much for your time. Thank you, Mr. Shea. Mr. Sink, you may reply. I have to respond to the real estate comment because Mr. Reynolds was a long-term... Do you hold a real estate license? I don't. But Mr. Reynolds was a long-term employee of our NLQ years and he was, as there is evidence in the record, a repeat workers' compensation filer, which lends even more credibility to finding that he was not credible by arbitrary means. Why is that? Because he had filed... Because he's filed a complaint? No, no, no. Maybe he got hurt? No, because he knew the system. He knew there was a free clinic right around the corner from his home that was open 24 hours, 7 days a week, and that his excuse that he couldn't get a doctor's appointment was absolutely bull. Because he knew that he had accessed our NLQ system many times before. His witness also did. Their testimony that they couldn't take time off of work was also destroyed by the fact that over the next two weeks when Mr. Garrett said that he was helping him load and unload trucks, Mr. Garrett was off on vacation. And that's shown in the calendar sets that you have. So we have to talk about that. We have to talk about the fact that he was a heavy labor worker between September 14, 2007 and May 2, 2008 without missing a single day of work except for his personal vacation on February 21, 2008 where he was gone for a week. Never asked for help with any of his work, never missed a day of work for a doctor's, nothing. The photos about the bruising on his leg, very true, and we have not disputed that. But there were no photos of any bruising or abrasions or anything to his back. There was never a medical record indicating that there was swelling or anything with his back and lumbar spine. And that's important here because it goes back to a lack of causation evidence and insufficient evidence for which the commission could have overturned the arbitrator's decision. The commission differed dramatically from the arbitrator in that the commission said somehow after May 2, 2008, this petitioner could never work another day again after he had already exhibited working heavy labor work for a year almost after his date of exit. So somewhere the commission decided that after February 2 or after August 30, once Dr. Fulbright released him to return to work, he was okay not to work anymore and he could be off on social security disability. And it was all R&L Carrier's fault from the prior September, which made no sense because there was zero medical evidence to back that up. Again, we would ask you to overturn the commission because their decision was based on speculation. It had no rational medical evidence in support of it whatsoever. Thank you very much. Thank you, counsel, for your arguments in this matter of taking an advisement on this positional issue.